**In Re the Matter of Colleen W. LONGO \*,**

v.

**Robert L. TILLMAN.**

**No. CS95–04926.**

Family Court of Delaware, Sussex County.

Submitted: July 1, 2002.
Decided: July 23, 2002.

\* Pseudonyms have been assigned to the parties to protect their identities.

Dennis L. Schrader, Wilson, Halbrook & Bayard, Georgetown, for mother.

Paul Enterline, Paul G. Enterline, Attorney at Law, Georgetown, for father.

HENRIKSEN, J.

This is the Court's decision on the Emergency Petition for Visitation Modification filed by Colleen W. Longo ("mother") against Robert L. Tillman, Jr., ("father") in the interest of their two (2) minor children, twelve (12) year old Robert L. Tillman, III, also known as "Troy", and almost nine (9) year old Timothy Tillman.

Because of the acts of domestic violence which have occurred between father and his present wife, Anna Tillman, mother seeks to exclude stepmother from being present during father's visitation.

## BACKGROUND

Pursuant to a Consent Order dated April 2, 1996, the parties agreed upon joint custody with physical placement awarded to mother, and visitation awarded to father. The parties agreed upon father having every-other-weekend visitation, every Wednesday evening visitation, alternating holidays, and allowing father one (1) week of vacation visitation during the summer.

In a subsequent Order dated June 23, 1997, the parties agreed to expand father's visitation by allowing father four (4) weeks summer visitation for the summer of 1997, and six (6) weeks for all summers thereafter. Father was also awarded one (1) week during the Christmas holiday.

## LEGAL STANDARD

Pursuant to Title 13, Section 728(a), the non-placement parent shall have visitation *"consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with one parent would endanger the child's physical health or significantly impair his or her emotional development. The Court shall specifically state in any Order denying or restricting a parent's access to a child the facts and conclusions in support of such a denial or restriction."* In determining the best interests of a child, the Court considers all relevant factors, including those specific factors set forth in Title 13, Section 722(a).[1]

---

**1.** The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:

    (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

Of the several criteria set forth in Title 13, Section 722(a), the Court must consider evidence of domestic violence as provided in Chapter 7A of Title 13.[2] Chapter 7A of Title 13 has as its stated purpose the protection of *"children from domestic violence and the harm caused by experiencing domestic violence in their homes."*[3] Pursuant to Title 13, Section 703A (a): *" 'Domestic violence' includes but is not limited to physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent's home, or against any other adult living in the child's home. "Domestic violence" does not include reasonable acts of self-defense by 1 parent for self-protection or in order to protect the child from abuse or threats of abuse by the other parent or other adults living in the child's home.' "*

The Child Protection From Domestic Violence Act also contains a provision which specifically focuses on limitations of visitation where domestic violence has occurred between members of the household. Specifically, the wording states: *"Notwithstanding the other provisions of this title, in all cases in which the Court finds by a preponderance of the evidence that 1 of the child's parents has committed an act of domestic violence against the child, against the other parent or against any other person living in the child's household the Court shall determine a schedule, location and conditions for visitation that best protects the child and the victim of domestic violence from further violence."*[4]

### FACTS

On June 12, 2002, this Court had the opportunity to interview twelve (12) year old Robert Tillman, hereinafter referred to as Troy, and almost nine (9) year old Timothy Tillman. At the time, Troy was completing the sixth (6th) grade, and Timothy was completing the third (3rd) grade. A review of the Court's Order of June 12, 2002 will state with more detail the communications made by these two (2) children to the Court. Suffice it to say, however, that both young men recognized that there was frequent turmoil between their father and his present wife, Anna. According to both boys, the frequent arguments between their father and stepmother did not include physical altercations. However, as observed by the children, the environment of frequent arguing in father's

(2) The wishes of the child as to his or her custodian(s) and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to the child under § 701 of this title; and

(7) Evidence of domestic violence as provided for in Chapter 7A of this title.

2. "Domestic violence" includes but is not limited to physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent's home, or against any other adult living in the child's home. "Domestic violence" does not include reasonable acts of self-defense by 1 parent for self-protection or in order to protect the child from abuse or threats of abuse by the other parent or other adults living in the child's home.

3. Tit. 13, Section 702A.

4. Tit. 13, Section 708A.

household was in sharp contrast to the healthy and loving environment which presented itself in the household of mother and her present husband, William. Both children indicated that they liked doing things with their stepfather. On the other hand, Troy indicated that he would not mind visiting his father without stepmother present, although he also indicated that he still wanted to see stepmother at times. Troy also emphasized that he liked spending time with his stepbrother and stepsister, ten (10) year old Justin and thirteen (13) year old Saleena. Justin and Saleena are stepmother's two (2) of three (3) younger children. Stepmother also has a sixteen (16) year old son who resides primarily with stepmother's ex-husband.

Mother and father were divorced July 25, 1996. Father remarried stepmother in July of 1998. Father described his relationship with stepmother as people who have argued, noting that "everybody does". Prior to March of 2002, father described those arguments as occurring one (1) time a week. The arguments have included yelling, pushing and shoving, and striking each other. Father emphasized, however, that the arguments never occurred in front of the children. Three (3) separate past incidences between father and stepmother have led to stepmother signing out three (3) different arrest warrants against father. Eventually, all charges on each of these separate occasions were dropped. As best the Court can calculate, the first (1st) of those major occasions occurred in the summer of 2000.

In June of 2001, father and stepmother got into a second (2nd) major altercation which led to mother burning father on the hand with her cigarette. According to father, he and stepmother became involved in an argument at the Tap Room in Millsboro, Delaware when stepmother became upset that father was talking to some other women. Father had consumed at least a six (6) pack of beer on that occasion, and stepmother was probably drinking mixed drinks. According to father, stepmother had consumed enough to impair her judgment. In addition to burning father with a cigarette, stepmother also slapped father and ran over his foot with a Jeep. Stepmother then had father arrested, but the charges were eventually dropped. It was never made clear to the Court why father was arrested, and not stepmother.

On November 24, 2001, the parties became involved in a third (3rd) major altercation, this time at father's class reunion. On this occasion, stepmother bit father on the cheek. Stepmother again pressed charges against father. These charges were also eventually dropped. However, a No Contact Order was placed against father. As a result, father lived apart from stepmother from late November of 2001 until sometime in February of 2002. As in all previous occasions, it was never made clear why the father was the individual that was arrested, and not stepmother.

Since February of 2002, father stated that he and stepmother have had verbal disagreements over his work hours and coming home too late. These would often include what father described as "a few choice words".

At some point in time between January 1, 2002 and the filing of mother's emergency petition on March 25, 2002, mother and father had some discussions between them in which father agreed with mother not to allow stepmother to have contact with the children. Father filed a divorce against stepmother dated February 20, 2002. In addition to alleging divorce grounds of incompatibility, father alleged as his grounds of divorce stepmother's misconduct for physical and emotional abuse. The divorce is still pending in Family Court File No. CS02–03285, Petition No. 02–05648.

According to father, the allegation of physical abuse was because stepmother had bitten him on the face. The allegation of emotional abuse was because of "all of the arguing."

Father indicated that he moved back into the home with stepmother sometime in February of 2002. For a time, father was sleeping in a separate room and locking his door, with father not remembering if this was in February or March of 2002. Paragraph Six (6) of father's Divorce Petition stated *"The parties separated on November 26, 2001, for which time they have lived separate and apart from each other as husband and wife except for a failed attempt at reconciliation of their differences as husband and wife."*

Father has now been married to stepmother for approximately four (4) years. During that time period, approximately two (2) years ago, stepmother's son Justin was sent by stepmother to live with her sister. Justin had been caught at school writing profanity in library books. According to father, Justin was placed at stepmother's sister's home because father and stepmother had concerns about possible involvement of the Division of Family Services.

Father also admitted to mother, confirming an incident that was related to mother by the children, that stepmother had kicked father in the groin sometime in February of 2002. Father testified, however, that this may have been "an accident". No charges were filed out of this particular incident.

Since the Court's probable cause hearing was held approximately three (3) weeks ago, father has made attempts to contact various counseling centers so that he and stepmother could undertake marriage counseling. Father testified that he and stepmother have an appointment scheduled at the Bridge Counseling Service on July 10, 2002. Father also told the Court that he and stepmother had been involved in approximately six (6) to ten (10) counseling sessions approximately two (2) years ago with a counselor named Helen Bunting–McCool. Father also believed that stepmother had attended some type of individual counseling in Seaford, Delaware during 2001, but did not believe stepmother had been to a counselor in 2002.

Both parents agreed that both of their children have certain health issues. Troy has been described as obese. He has had this condition for almost all of his life. The parents have taken Troy to the A.I. DuPont Institute, where nothing was diagnosed as being medically wrong. Troy also suffers from certain learning disabilities, but he has done well in school the past year. Troy shows no signs of aggression.

Timothy is an autistic child. He suffered from pneumonia approximately ten (10) times in the last several years. As a result, he uses a nebulizer, and is still undergoing testing to determine the reasons for the frequent pneumonia. Thus far, doctors have determined that Timothy does not suffer from asthma nor allergies. Although Timothy did not reach all of his goals in school this year, mother stated that Timothy did well in school.

No reports were received from the schools concerning either of the boys having problems showing aggression in school. However, mother has noticed Timothy showing some signs of aggression in the past four (4) months. She stated that Timothy has shown this aggression on a daily basis, and found no specific pattern related to visitations with father. Mother surmised that stepmother is not a good influence on the children. Mother noted that Timothy, being autistic, is very trusting, and mother believes that Timothy's

observations of stepmother are creating his aggressive posture. However, mother presented no expert testimony to substantiate her theory. Furthermore, mother admitted that she could not exclude other possibilities that might be causing Timothy's recent aggressive behavior.

Mother indicated that her marriage to father lasted approximately seven (7) years. Mother and father argued during that time, but the arguments were not loud. Furthermore, there was never any physical abuse between mother and father, although mother indicated that she was afraid of father at times when father drank excessively.

## REASONING

It is mother's wish that stepmother be excluded from visitations so that the children are not exposed to the argumentative and potentially violent climate between father and stepmother. Father does not desire any change in visitation. Father, although acknowledging that he and stepmother often argue, maintains that all couples argue. The Court has serious concerns, that arguments in the past year since June of 2001 have led to at least two (2) situations of physical assault by stepmother towards father. Furthermore, both of these occasions, along with one (1) earlier occasion, led to the filing of criminal charges by mother against father. The fact that in less than eighteen (18) months three (3) separate incidences in this marriage have escalated to the filing of arrest warrants by one spouse against the other is indicative of an unhealthy relationship existing between father and stepmother.

When considering the maturity of these two (2) boys, the Court cannot help but consider their health issues which tie into their maturity level. Although Troy just completed the sixth (6th) grade, he is a special education student. He suffers from obesity, for which he is sometimes teased by classmates. Timothy is an autistic child placed in special classes at the third (3rd) grade level. Although there was no expert witness to suggest that these children might, because of these complexities, have a lower maturity level than children generally at their ages, the reality of this concept is so clear to the Court that it does not require expert testimony. The court believes, however, that it would need expert testimony to help the Court determine if such special children would be more highly influenced than other children by the arguments they observe going on in the home of father and stepmother. Unfortunately, mother presented no expert testimony which might have proved to the Court that father's visitation with the children, in the presence of stepmother, was causing significant physical or emotional harm to the children.

Both of the children have indicated a strong preference to spend a lot of time with mother and stepfather. They have also expressed a desire to be able to see their father on occasions when stepmother is not present. Thus, it appears that the interaction the children have with their stepfather, William, is beneficial to the children. The Court could not find, at least based upon statements from the children, that the interaction with their stepmother, Anna, was of significant benefit in their lives.

Again, because of the lack of expert testimony, the Court does not know what effect a modification of visitation would have on any adjustments in these childrens' lives. Also, it appears that mother and father have cooperated in the past in the best interests of these children, and father's support is also current. Thus, it is clear that both mother and father have

complied with their basic responsibilities as parents under Title 13, Section 701.

Although mother has failed to prove to this Court that the continued presence of stepmother during father's visitation would endanger their physical health or significantly impair their emotional development, the Court cannot ignore the past serious acts of obvious domestic violence which have occurred between father and stepmother, and the obvious angry turmoil that continues to exist in father's and stepmother's home.

Father claimed the violence has not occurred in the presence of the children. However, given the statements by both children, it is clear that they are both very much aware of the turmoil that exists in father and stepmother's home.

Father's attorney suggested that the visitation limitations contained in the Child Protection From Domestic Violence Act, at Title 13, Section 708A, do not apply in this case. As correctly pointed out by father's attorney, the wording of the statute calls to attention acts of domestic violence committed by the "parent". The statute does not mention acts committed by a stepparent. At the same time, however, Title 13, Section 708A focuses on violence between persons living in the child's household. Given the overall purpose of the Child Protection From Domestic Violence Act, which not only intends to protect children from domestic violence, but also protects children from the harm caused by experiencing domestic violence in their homes, the Court cannot ignore the obvious environment of domestic violence which has in the recent past existed on a regular basis in father's home. Thus, whether we view the violent acts that have been committed in the home as the acts of the stepparent, and we equate a stepparent to a parent, or if we view the father's failure to remove himself and the children from the home in

which the stepparent inflicts domestic violence on father, the clear overall intent of the statute is to protect children from not only violence against them, but also from the violence that the children would observe in the home. Our Legislature, as indicated in the purpose clause of the domestic violence statute, has deemed the negative atmosphere created in a home where adults have committed various separate acts of domestic violence against each other, and where there is ongoing turmoil between the adults in the form of regular verbal arguments, even though the specific acts of physical violence were not observed by or directed at the children, to be predictively harmful to the children. As such, the Court has the power to impose limitations on situations such as the case at hand where such a negative home atmosphere exists.

Based upon the testimony the Court heard, father's home is not an environment which simply includes occasional arguments. Instead, it is a home where the arguments have escalated to the extreme level of cigarette burns, biting, kicking in the groin area, and filing of arrest charges against the other spouse. This is not an appropriate environment for these children.

Accordingly, in the best interests of these two (2) children, the Court finds that there is reason to impose certain conditions upon father's visitation. Were it not for the Child Protection From Domestic Violence Act, the Court could take no action at this time, where mother has failed to meet the level of proof that father's visitation with the children in stepmother's presence endangers the childrens' physical health or significantly impairs their emotional development. More simply stated, mother has not proved that the children have been significantly harmed. Before the passage of the Child Protection From

Domestic Violence Act, it was necessary to prove the significant harm required by Title 13, Section 728(a) by proof of the child's symptoms caused by past exposure to the environment. Unfortunately, by the time the proof was sufficient to prove the significant harm, the damage was done and the child was often irreversibly scarred. But with the passage of the Child Protection From Domestic Violence Act, our Legislature has recognized the importance of protecting children before they are permanently scarred from the predictive harm that will most certainly follow where a household presents an ongoing environment of domestic violence.

This decision does not say that children should be removed from a home or kept from an individual whenever there is proof that a single act of domestic violence occurred between the adults residing in a home. But where, as in this case, there is clear and convincing evidence that the children are residing in an environment where they are observing ongoing arguments between the adults, and where now on at least three (3) separate occasions those arguments have escalated to specific acts of violence inflicted by one adult against the other, even though those specific violent acts were not observed by the children, the Court must act in the childrens' best interests by recognizing the predictive harm to the children and by imposing conditions on visitations to protect the children.

### CONCLUSION

Based upon the foregoing,

**IT IS HEREBY ORDERED** that father's visitation as set forth in the Court's Order dated June 23, 1997 is hereby modified as follows:

1. For the summer of 2002, father shall have extended visitation with the children from 9:00 a.m. on Saturday, August 10, 2002 until 4:00 p.m. on Saturday, August 17, 2002, and again from 9:00 a.m. on Monday, August 26, 2002 until 4:00 p.m. on Saturday, August 31, 2002. As such, father's six (6) week extended summer visitation shall not occur during the summer of 2002, but shall resume in the summer of 2003.

2. The extended summer visitation for 2002, as set forth above, shall occur without the presence of stepmother, Anna Tillman. Father's Wednesday evening visitations, however, may include stepmother. Furthermore, subject to the wording of Paragraph Four (4) of this Order, stepmother shall also not be present for father's alternate weekend visitation, holiday visitation, or school vacation visitation.

3. Except for the above-noted changes, father's visitation shall continue as per the prior Order of this Court dated June 23, 1997, but under the following conditions:

   a. Father and stepmother are ordered to commence joint counseling no later than August 1, 2002, and shall continue in counseling following the recommendations of the counselor. Such counseling sessions shall occur not less than once every two (2) weeks for at least the next six (6) consecutive months.

   b. In addition to the joint counseling previously ordered, father and stepmother, within thirty (30) days of the date of the mailing of this Order, shall each be evaluated for alcohol abuse and anger management, and each shall follow the treatment recommendations of the counselor thereafter.

c. Father and stepmother shall authorize and direct the counselor and/or counselors for both the joint counseling, as well as the alcohol abuse and anger management counseling, to provide to mother's attorney monthly statements in which the counselor and/or counselors identify the recommended appointment schedule set forth by the counselor, including the minimal limitations set forth by this Court, and also whether or not the father and stepmother are attending those appointments.

4. After six (6) months from the date of this Order, all restrictions against the involvement in visitation by stepmother shall be lifted, and the Order shall thereafter proceed according to the prior Order of this Court dated June 23, 1997, without restriction. If father and stepmother have failed to comply with the terms of this Order, then and in that event, the Court will entertain a motion filed by mother, supported by appropriate affidavit and other documentation, wherein mother requests that there be no further involvement of stepmother, or that there be continued limitations, during father's visitation. The Court may thereafter issue a new Order after consideration of the moving documents, and any answer and supporting affidavit and documents filed thereto, and the Court may also set a hearing on the matter.

**IT IS SO ORDERED.**